07 CA 10704 MLW

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, on behalf of itself and all others similarly situated, Plaintiff, v. BRAINTREE LABORATORIES, INC., Defendant. | Civil Action No. JURY TRIAL DEMANDED |

MAGISTRATE JUDGE JLA

## CLASS ACTION COMPLAINT

Plaintiff, Philadelphia Federation of Teachers Health and Welfare Fund, on behalf of itself and the class defined below, brings this action against Defendant Braintree Laboratories, Inc. ("Braintree" or "Defendant") and alleges as follows based upon personal knowledge as to matters relating to itself and upon the investigation of its counsel and information and belief as to all other matters:

## NATURE OF THE CASE

1. This case arises from Braintree's anti-competitive scheme to block entry of generic competition in order to maintain its monopoly power in the United States over the brand named drug MiraLax and any actual or potential A-rated generic competitors. Braintree's scheme was intended to, and succeeded in, allowing it to charge supracompetitive prices for MiraLax, causing Plaintiff and members of the class to pay overcharges on their purchases.

2. MiraLax is an osmotic laxative, manufactured and marketed by Braintree, that causes water to be retained in the stool. The active ingredient of MiraLax is polyethylene glycol 3350. MiraLax was approved by the United States Food & Drug Administration ("FDA") in

February 1999 for the treatment of occasional constipation.

3. As alleged in greater detail herein, Braintree engaged in a scheme involving U.S. Patent No. 5,710,183 (the "'183 patent") issued by the United States Patent and Trademark Office ("PTO"). This misconduct involved, *inter alia*, the improper listing of the '183 patent with the FDA, and improperly asserting infringement claims based on the '183 patent.

4. Braintree acted improperly to procure the listing of the '183 patent with the FDA in order to position itself to enforce the patent by filing patent infringement claims against any potential competitor seeking FDA approval to manufacture and sell a competing, generic version of MiraLax. Braintree knew that the mere filing of such patent infringement claims would block the market entry of potential competitors, irrespective of the merits of the claims.

5. Braintree then instituted a baseless lawsuit against a potential competitor for the purpose of forestalling generic competition. In May 2003, Braintree filed a patent infringement lawsuit against Schwarz Pharma Manufacturing, Inc. ("SPMI"), a company seeking FDA approval to market a generic version of MiraLax, even though Braintree knew that the '183 patent was improperly procured and that no reasonable claim of infringement could be based upon it.

6. Braintree filed this lawsuit not for any legitimate purpose, but because it knew that the mere filing of such litigation would raise barriers to the entry of generic competition, including automatically delaying the FDA's granting of final marketing approval to SPMI's generic version of MiraLax. Without such approval, generic manufacturers cannot bring their products to market.

7. By its unlawful acts, Braintree has willfully and unlawfully maintained its

monopoly power over MiraLax and generic and bioequivalent forms of the drug.

8. Braintree's anticompetitive scheme was successful for a time in protecting its MiraLax revenues from generic competition.

9. Plaintiff and the Class it seeks to represent are end-payors of MiraLax; that is, indirect purchasers who paid for MiraLax and any generic version for use, and not for resale. Through its illegal conduct, Braintree unlawfully deprived Plaintiff and other end-payors of access to substantially lower-priced generic versions of MiraLax. Braintree has caused Plaintiff and the class to overpay for polyethylene glycol 3350 by many millions of dollars.

10. In Count I of this Complaint, Plaintiff, on behalf of itself and all others who are end-payors of MiraLax, seek equitable, injunctive and declaratory relief against Defendant pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 based on allegations of monopolization of, and an attempt to monopolize, the market for MiraLax and its generic bioequivalents, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

11. Counts II and III are brought by Plaintiff on behalf of itself and those Class members who purchased or paid for MiraLax and its generic equivalents in Arizona, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Louisiana, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin (the "Indirect Purchaser States"). Counts II and III are brought pursuant to the antitrust and unfair and deceptive trade practices acts of the Indirect Purchaser States.

12. Count IV is brought by Plaintiff on its own behalf and on behalf of the Class, seeking a constructive trust and disgorgement of the unjust enrichment of Defendant.

**JURISDICTION AND VENUE**

13. This action is brought under Section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive and equitable relief to remedy Defendant's violations of the federal antitrust laws, particularly Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 26. In addition, this Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(d), as amended in 2005, and 28 U.S.C. § 1367. The amount in controversy exceeds five million dollars ($5,000,000).

14. Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) because Defendant is a Massachusetts corporation, transacts business, is found, and has agents in this district; and because a substantial portion of the affected trade and commerce described below has been carried out in this district.

15. The illegal monopolization and attempt to monopolize the market for MiraLax and generic versions of MiraLax, as alleged herein, have substantially affected interstate and foreign commerce.

**PARTIES**

16. Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("Teachers' Fund" or "Plaintiff") is located at 1816 Chestnut Street, Philadelphia, Pennsylvania, and is a voluntary employee benefits plan organized pursuant to Section 501(d) of the Internal Revenue Code for the purpose of providing health benefits to eligible participants and beneficiaries. The Teachers' Fund provides health benefits, including prescription drug coverage benefits, to approximately 20,000 active participants and their spouses and dependents.

17. Defendant Braintree Laboratories, Inc. is a privately held corporation organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at 60 Columbian Street West, Braintree, Massachusetts 02185-0929.

## INTERSTATE TRADE AND COMMERCE

18. During all or part of the class period (defined below), Defendant manufactured and sold substantial amounts of MiraLax in a continuous and uninterrupted flow of commerce throughout the United States.

19. At all material times, MiraLax was manufactured and sold by Defendant and was shipped across state lines and sold to customers located outside its state of manufacture.

20. During all or part of the class period, Defendant transmitted funds as well as contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state lines in connection with the sale of MiraLax.

21. In furtherance of its efforts to willfully obtain and/or maintain monopoly power over MiraLax and its generic equivalents, Defendant employed the United States mails and interstate and international telephone lines, as well as means of interstate and international travel.

22. Defendant's efforts to willfully obtain and/or maintain monopoly power over MiraLax and its generic equivalents, as alleged herein, has substantially affected interstate and foreign commerce.

## FACTUAL ALLEGATIONS

### A. Brand-Name Drugs vs. Generic Drugs

23. The prescription drug industry, including the manufacture, marketing, distribution and sale of prescription drugs, is one of the most profitable industries in the United States. The

U.S. market accounts for more than 40% of the world's prescription pharmaceutical revenues. The cost of prescription drugs in the United States has been rising at a rate of 14% to 18% per year, and the cost of drugs dispensed in the United States for the year 2006 was in excess of $275 billion.

24. The availability of generic drugs has been one of the most effective means of lowering the cost of prescription drugs. Generic drugs, which also must be approved by the FDA, have the same active chemical composition and provide the same therapeutic effects as the pioneer brand-name drugs upon which they are modeled. The FDA will assign an "A" rating to generic drugs that are therapeutically equivalent to pioneer or brand-name drugs.

25. To be deemed a therapeutic equivalent and assigned an "A" rating by the FDA, the generic drug must contain the same active ingredient(s); dosage form and route of administration; and strength. If so, the generic drug, as a therapeutic equivalent, can be substituted (and in some instances must be substituted) for the pioneer or brand-name drug at the pharmacy dispensing the drug.

26. Generic drugs are normally priced substantially below the brand-name drugs to which they are bioequivalent. A 1998 study conducted by the Congressional Budget Office (the "CBO") concluded that generic drugs save consumers and third-party payors between $8 billion and $10 billion a year. A report prepared by the Government Accounting Office in August 2000 observed, "Because generic drugs are not patented and can be copied by different manufacturers, they often face intense competition, which usually results in much lower prices than brand-name drugs."

27. The Federal Trade Commission ("FTC") estimates that the first generic

manufacturer to enter the market typically charges between 70% and 80% of the price of the brand-name drug. As additional manufacturers bring generic versions of the drug to market, the price continues to drop.

28. A brand-name drug loses a significant portion of its market share to generic competitors soon after the introduction of generic competition, even if the brand-name manufacturer lowers prices to meet competition. The 1998 CBO study estimates that generic drugs capture at least 44% of the brand-name drug's market share in just the first year of sale.

**B. The Federal Scheme For Approval Of Pioneer Drugs**

29. Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (the "Act"), a company is required to have FDA approval before it may begin selling a new drug. Pre-market approval for a new drug, often referred to as a "pioneer" or "brand-name" drug, must be sought by filing a New Drug Application ("NDA") with the FDA, demonstrating that the drug is safe and effective for its intended use. New drugs that are approved for sale in the United States by the FDA are typically (but not necessarily) covered by patents that provide the patent holder with the exclusive right to sell the new or pioneer drug in the United States for the duration of the patents involved, plus any extension of the original patent period (the "FDA Exclusivity Period") granted pursuant to the Drug Price Competition and Patent Term Restoration Act of 1984, 98 Stat. 1585, 21 U.S.C. § 355 ("Hatch-Waxman Act").

30. In addition to information on safety and efficacy, NDA applicants must submit to the FDA a list of all "prior art," as well as patents that claim the drug for which FDA approval is being sought or that claim a method of using the drug and with respect to which a claim of patent infringement could reasonably be asserted. "Prior art" is the term used in patent law to refer to

that body of previous knowledge and technology against which a patent application is judged to determine whether the claim is sufficiently novel to merit patent protection. When the NDA is approved, the FDA "shall publish" the patent information submitted by the NDA applicant. 21 U.S.C. § 355(b)(1).

31. Once the NDA is approved, the FDA lists any patents referenced as part of the NDA application process in a publication known as the *Approved Drug Products With Therapeutic Equivalence Evaluations*. This publication is commonly called the "Orange Book." In listing patents in the Orange Book, the FDA merely performs a ministerial act. The FDA does not check the facts supplied to it by the brand name manufacturer, but trusts that the manufacturer will be truthful.

32. Once the safety and effectiveness of a new drug is approved by the FDA, it may be used in the United States only under the direction and care of a physician who writes a prescription, specifying the drug by name, which must be dispensed by a licensed pharmacist. The pharmacist must, in turn, fill the prescription with the drug brand specified by the physician, unless an A-rated generic version of that pioneer drug which has been approved by the FDA is available.

**C. Prescriptions for Generic Drugs**

33. Generic drugs are drugs that the FDA has found to have the same active chemical composition and provide the same therapeutic effects as the pioneer, brand-name drugs. Where a generic drug is completely equivalent to a pioneer or brand-name drug, the FDA assigns the generic drug an "A" or "AB" rating.

34. If a generic version of a brand-name drug exists and the physician has not

specifically indicated on the prescription "DAW" or "dispense as written" (or similar indications, the wording of which varies slightly from state to state), then: (a) for consumers covered by most insurance plans, the pharmacist will substitute the generic drug; and (b) for consumers whose purchases are not covered by insurance plans, the pharmacist will offer the consumer the choice of purchasing the branded drug, or the A-rated generic at a lower price.

35. Once a physician writes a prescription for a brand-name drug such as MiraLax, that prescription defines and limits the market to the drug named or its A-rated generic equivalent. Only drugs that have received an A generic rating from the FDA may be substituted by a pharmacist for a physician's prescription for a brand-name drug.

**D. Abbreviated New Drug Applications For Generic Drugs**

36. Congress enacted the Hatch-Waxman Act in 1984 to establish an abbreviated process to expedite and facilitate the development and approval of generic drugs. Consumers benefit from the choice and competition. To effectuate its purpose, the Hatch-Waxman Act permits a generic drug manufacturer to file an Abbreviated New Drug Application ("ANDA"), which incorporates by reference the safety and effectiveness data developed and previously submitted by the manufacturer of the original, pioneer drug. The Hatch-Waxman Act also provides an economic incentive to the first ANDA filer for a particular generic drug: a 180-day statutory period of market exclusivity, during which time the manufacturer has the right to market its drug free from competition from other generic manufacturers.

37. The ANDA must include information concerning the applicant's position *vis-à-vis* the patent that the pioneer drug manufacturer claims applies to the drug. Therefore, the ANDA filer must make one of four certifications:

I. that no patent for the pioneer drug has been filed with the FDA (a "Paragraph I Certification");

II. that the patent for the pioneer drug has expired (a "Paragraph II Certification");

III. that the patent for the pioneer drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or

IV. that the patent for the pioneer drug is invalid or will not be infringed upon by the proposed generic company's product (a "Paragraph IV Certification").

21 U.S.C. § 355(j)(2)(A)(vii). In the case of a patent that has not yet expired, the ANDA applicant's only certification options are Paragraph III or IV Certifications.

38. If the ANDA contains a Paragraph IV Certification, the ANDA applicant must provide notice to the owner of each patent that is referred to in the certification, and to the holder of the approved NDA to which the ANDA refers. *See* 21 U.S.C. § 355(j)(2)(B)(I). The notice must include a detailed statement of the factual and legal basis for the ANDA applicant's assertion that the patent is not valid or will not be infringed by the generic product. *See id.*; 21 C.F.R. § 314.95.

39. The brand-name drug patent owner, upon receiving a Paragraph IV Certification from an ANDA applicant, has 45 days to initiate a patent infringement suit against the applicant. *See* 21 U.S.C. § 355(j)(5)(5)(iii). If no action is initiated within 45 days, the process for FDA approval of the generic product is not delayed by patent issues. However, if a patent

infringement suit is brought within the 45-day window, FDA approval of the ANDA is automatically postponed until the earliest of the expiration of the patents, the expiration of 30 months from the patent holder's receipt of notice of the Paragraph IV Certification, or a final judicial determination of non-infringement.

40. Accordingly, brand-name drug patent holders need only to file a patent infringement lawsuit within 45 days of receipt of Paragraph IV Certification in order to automatically block an ANDA applicant's generic drug from entering the market for up to 30 months.

41. An improper Orange Book listing also has additional anti-competitive effects because the first generic company to file an ANDA with a Paragraph IV Certification is, upon FDA approval, granted a 180-day period of exclusivity in relation to other generic manufacturers. 21 U.S.C. 355(j)(5)(B)(iv). This 180 day exclusivity against other generic competitors is awarded to the first Paragraph IV filer regardless of whether or not the brand company institutes pre-approval patent infringement litigation in response to the Paragraph IV certification. Absent an improper Orange Book listing, no Paragraph IV certification would be required and, thus, no generic company would receive 180-day exclusivity.

42. Defendant was at all times fully familiar with the ability to delay the entry of generic competition by improperly manipulating the patent listing and pre-approval litigation provisions of the Hatch-Waxman Amendments.

**E. Defendant's Unlawful Scheme to Quash Generic Competition**

**1. The '183 Patent Approval, Acquisition by Braintree, and Listing in the Orange Book**

43. Braintree has asserted that the '183 patent covers MiraLax and bars generic

competition. The '183 patent claims, *inter alia*, a composition for the improvement of bowel function comprising polyethylene glycol and a fiber bulking agent, wherein the polyethylene glycol is present in a weight ratio of polyethylene glycol to fiber of at least about 1:2 and no more than about 7:1.

44. The patent application was filed on July 14, 1995. George M. Halow of El Paso, Texas was listed as the inventor.

45. During the prosecution of the '183 patent, the Examiner issued an Office Action dated February 25, 1997, rejecting claims 1-33 in the '183 patent. The Examiner found that the combination of several references - Kais, Powell, Parker/Kimura, and Fordtran - teach polyethylene glycol with a fiber bulking agent.

46. Claim 34, which ultimately issued as claim 33, is for "a method for improving bowel function in a mammal, comprising orally administering polyethylene glycol to the mammal in an amount sufficient to improve bowel motility, stool formation or both." Claim 34 (issued as claim 33) makes no reference to use of a fiber bulking agent.

47. The Examiner separately rejected claim 34 as obvious in light of Kimura or Fordtran, as both references teach compositions containing polyethylene glycol to improve bowel movement.

48. Halow, and/or individuals acting on his behalf, represented to the PTO in a response dated May27, 1997, that claims 1-34 "provide a unique composition containing polyethylene glycol and a fiber bulking agent wherein PEG is present in a weight ratio of polyethylene glycol to fiber of from about 1 to 2 to no more than about 7 to 1. These percentages are critical and nowhere are they discussed or taught in the base references or the

alleged equivalence teaching set forth by the secondary references."

49. Additionally, Halow and/or individuals acting on his behalf emphasized in the response the critical nature of the ratio of polyethylene glycol and fiber by explaining that if "the PEG to fiber ratio is too low, rapid onset of activity of the products of the invention drops off and begins to approach the low onset of a fiber based bulk laxative of the prior art. If the PEG to fiber ratio is too high, the volume of composition which must be ingested to obtain the benefits of the fiber content may be too high and the excess PEG may result in undesirable effects, such as those associated with PEG based bowel lavage compositions, such as those set forth in Kimura, et al or Fordtran."

50. The Examiner issued a Notice of Allowance reasoning that "the claims are considered to distinguish over the prior art since there is no teaching of the ratio for the two active ingredients."

51. The '183 patent was issued on January 20, 1998.

52. Crucially, 32 of the 33 claims in the '183 patent were limited by the ratio for the two active ingredients. Claim 33, however, issued unchanged and without this restriction, despite having been rejected by the PTO because it was prior art.

53. On information and belief, Braintree had previously, in approximately 1985 and 1990, sought to patent polyethylene glycol 3350, but each time the PTO rejected Braintree's patent application because it was based on prior art.

54. On information and belief, when Braintree filed its NDA for MiraLax, Braintree owned no patents that covered MiraLax.

55. On information and belief, Braintree learned about the '183 patent while its NDA

for MiraLax was pending.

56. On information and belief, Braintree's counsel examined the '183 patent issued to Halow and concluded, in a letter dated December 23, 1998, sent to Halow, that claim 33 of the '183 patent was directly anticipated by the prior art, and hence invalid.

57. On information and belief, Braintree paid Halow a nuisance-value payment of approximately $15,000 for a non-exclusive license of the '183 patent.

58. On information and belief, Braintree nevertheless listed the '183 patent in the FDA's *Orange Book* in 1999, the same year that Braintree received final marketing approval for its MiraLax NDA and began selling MiraLax.

59. On information and belief, Braintree did not purchase the '183 patent outright from Halow until late 2001, shortly before MiraLax would lose its marketing exclusivity on February 18, 2002.

**2. Braintree's Filing of a Sham Lawsuit**

60. On January 30, 2003, SPMI submitted an ANDA with the FDA for a generic version of Braintree's MiraLax. SPMI called its generic product GlycoLax. SPMI's GlycoLax is comprised of only polyethylene glycol and does not contain a fiber bulking agent.

61. In accordance with 21 U.S.C. § 355(j)(5)(B), SPMI sent Braintree a Paragraph IV certification letter on April 1, 2003.

62. On May 16, 2003, Braintree filed suit against SPMI for infringement of claim 33 of the '183 patent in the United States Court for the District of Delaware, thereby invoking the Hatch-Waxman Act's automatic 30-month stay. Braintree sued for patent infringement only as to claim 33.

63. On September 3, 2003 - more than three months after it filed the action - Braintree finally served a complaint on SPMI.

64. Braintree knew or should have known that its claims against SPMI were baseless. Specifically, Braintree knew or should have known:

(a) that the Examiner's objections to the claims issued in the '183 patent were only overcome by representations from Halow and/or persons acting on his behalf that it was the ratio of polyethylene glycol to the fiber bulking agent that was "critical" to the patent application and such ratio was not taught or otherwise rendered obvious by the prior art;

(b) the claims of the '183 patent, if read to cover pure polyethylene glycol compositions, calls into question the *bona fides* upon which the patent was issued;

(c) if construed to cover polyethylene glycol alone, claim 33 is invalid in view of prior art;

(d) if construed to cover polyethylene glycol alone, there were public uses of the patented subject matter outside the one year grace period set forth in 35 U.S.C. § 102(b);

(e) if construed to cover polyethylene glycol alone, there was no disclosure of polyethylene glycol only compositions, or their preparation or application, in accordance with the requirements of 35 U.S.C. § 112; and

(f) if construed to cover polyethylene glycol alone, the use of compositions comprising polyethylene glycol to treat constipation was known for twenty years prior to the filing of the Halow application on July 14, 1995.

65. Alternatively, Braintree knew or should have known that claim 33 cannot be construed to cover the use of polyethylene glycol alone and that SPMI's GlycoLax is comprised

of only polyethylene glycol. GlycoLax does not contain a fiber bulking agent.

66. On December 23, 2003, SPMI received a tentative approval letter from the FDA for its ANDA for GlycoLax. This approval would have become final but for Braintree's baseless lawsuit claiming that SPMI infringed claim 33 of the '183 patent. Indeed, as discussed below, Braintree's baseless lawsuit delayed even tentative approval. Absent such conduct, SPMI's generic version of MiraLax would have been approved and on the market much earlier.

67. On May 21, 2004, Braintree wrote to SPMI that it had decided to voluntarily dismiss its patent infringement claim against SPMI with prejudice and without costs. Braintree also offered SPMI a royalty-free license to claim 33 of the '183 patent.

68. On May 24, 2004, Braintree filed "Plaintiff's Motion for Voluntary Dismissal of its Complaint and Motion to Dismiss Defendant's First Counter Claim as Moot."

69. On June 3, 2004, the Court dismissed Braintree's complaint with prejudice, ending the remaining portion of the thirty month stay of SPMI's ANDA approval.

70. Less than one month later, on July 2, 2004, the FDA gave final approval of SPMI's ANDA for its GlycoLax product. Within days of the FDA's final approval, GlycoLax was shipped to customers in the United States.

**EFFECTS ON COMPETITION**

71. Braintree's exclusionary conduct has delayed generic competition to MiraLax and enabled Braintree to sell MiraLax without generic competition. But for Braintree's misconduct, one or more competitors would have begun marketing A-rated generic versions of MiraLax much sooner than such versions actually were marketed, and Braintree itself would have entered the market with its own generic version of MiraLax.

72. Braintree's unlawful conduct caused the ANDA approval process to be delayed by the FDA and caused SPMI to divert its resources from its ANDA application and to expend substantial resources on litigation. Absent the patent lawsuit, SPMI and the FDA would have had reason to, and would have, focused and directed their limited resources into the ANDA approval process for generic polyethylene glycol 3350. Such focus and resources would have brought earlier FDA approval and marketing of generic polyethylene glycol 3350. However, Braintree's baseless suit destroyed both SPMI's and the FDA's incentives to expedite review and approval of SPMI's ANDA because it triggered the Hatch-Waxman Act's automatic 30-month stay that would block marketing regardless of approval.

73. The FDA expeditiously approves ANDAs when the generic product that is the subject of the ANDA is not the subject of a patent infringement lawsuit under the Hatch-Waxman Act. For example, when an ANDA filer makes a Paragraph III Certification, certifying that it will only market the drug at issue upon expiration of a patent listed as applying to the drug in the Orange Book, FDA approval typically occurs on the very same day the patent expires.

74. In essentially every instance since the year 2000 involving a brand-name drug coming off patent for which an ANDA filer certified that it would market a generic version of the brand-name drug only upon expiration of the relevant patent (*i.e.*, a Paragraph III Certification), the FDA approved the generic applicant the very day (and in a few instances, within one or two days) of the expiration date of the patent. The ANDAs were consistently timely filed and approved regardless of the magnitude of the brand-name drug's annual sales. Moreover, the FDA approved SPMI's ANDA for generic polyethylene glycol 3350 less than one month after Braintree voluntarily dismissed its patent infringement claim against SPMI.

Accordingly, absent Braintree's exclusionary conduct here, the FDA would have promptly and timely approved SPMI's ANDA, permitting generic polyethylene glycol 3350 to enter the market substantially before the actual final approval July 2004, and even before the tentative approval in December 2003.

75. Braintree's scheme to delay the introduction into the U.S. marketplace of any generic version of MiraLax caused Plaintiff and the Class to pay more than they otherwise would have paid for polyethylene glycol 3350.

**ANTITRUST IMPACT UPON PLAINTIFF AND MEMBERS OF THE CLASS**

76. During the relevant period, Plaintiff and members of the Class purchased substantial amounts of MiraLax. As a result of Defendant's illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for their polyethylene glycol 3350 purchases. If generic competitors had not been unlawfully prevented from earlier entering the market and competing with Defendant, End-payor purchasers, such as Plaintiff, would have paid less for polyethylene glycol 3350 by (a) substituting purchases of less-expensive, generic polyethylene glycol 3350 for their purchases of more-expensive branded MiraLax; (b) receiving discounts and/or lowering prices on their remaining branded MiraLax purchases; and (c) purchasing generic polyethylene glycol 3350 at lower prices sooner.

77. As a consequence, Plaintiff and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount of such damages will be calculated after discovery and upon proof of trial.

**MONOPOLY POWER AND RELEVANT MARKET**

78. Prior to the entry of A-rated generic competition, Braintree had monopoly power